UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


UNITED STATES OF AMERICA,

                    Plaintiff,                          Case No.

                                                        Honorable

v.

One Hundred Twenty-Five Thousand
Eighty Hundred Sixty-Five Dollars and
Seven Cents ($125,865.07) in U.S.
Currency from Signature Bank Account
#XXXXXX6011; Ninety-Seven Thousand
Five Hundred Thirty-Nine Dollars and
Three Cents ($97,539.03) in U.S.
Currency from Signature Bank Account
#XXXXXX3045; Twenty-Four Thousand
Six Hundred Sixty-Eight Dollars
and Four Cents ($24,668.04) in U.S.
Currency from Signature Bank Account
#XXXXXX5147; Four Hundred Twenty-One
Thousand Two Hundred Fifty-Nine Dollars
and Twenty-Six Cents ($421,259.26) in U.S.
Currency from Signature Bank Account
#XXXXXX6003; Forty-Eight Thousand
Seven Hundred Forty-Five Dollars and
Thirty-Six Cents ($48,745.36) in U.S.
Currency from Signature Bank Account
#XXXXXX3157; Seven Hundred Thirteen
Dollars and Seventy-Five Cents ($713.75)
in U.S. Currency from TD Bank Account

1

#XXXXXX8327; Three Hundred Seventy-
Eight Thousand Five Hundred Fifty-Four Dollars
and Sixty-Five Cents ($378,554.65) in U.S.
Currency from TD Bank Account
#XXXXXX7349; One Hundred Sixty-
Five Thousand Nine Hundred Sixteen Dollars
and Ninety-Five Cents ($165,916.95) in U.S.
Currency from TD Bank Account
#XXXXXX9424; Nineteen Thousand One
Hundred Eighty-Four Dollars
and Ninety-Five Cents ($19,184.95) in U.S.
Currency from TD Bank Account
#XXXXXX8319; Thirteen Thousand Four
Hundred Seventy-Nine Dollars
and Seven Cents ($13,479.07) in U.S.
Currency from TD Bank Account
#XXXXXX7357,

Defendants *in rem*.
_____/

## **Complaint For Forfeiture**

Plaintiff, the United States of America, by and through Daniel L. Lemisch,

Acting United States Attorney for the Eastern District of Michigan, and Shankar

Ramamurthy and Philip A. Ross, Assistant United States Attorney, states upon

information and belief in support of this Complaint for Forfeiture as follows:

1.     This is an *in rem* civil forfeiture action pursuant to Title 18, United

States Code, Sections 981(a)(1)(A) and/or (a)(1)(C).

2.     This Court has original jurisdiction over this forfeiture action pursuant to Title 28, United States Code, Section 1345 as this action is being commenced by the United States of America as Plaintiff.

3.     This Court has jurisdiction over this forfeiture action, pursuant to Title 28, United States Code, Section 1355(b)(1)(A), as the acts giving rise to forfeiture occurred in the Eastern District of Michigan.

4.     Venue is proper before this Court pursuant to Title 28, United States Code, Section 1391(b)(2) as a substantial part of the events or omissions giving rise to the Plaintiff's claims occurred in the Eastern District of Michigan.

5.     Venue is also proper before this Court pursuant to Title 28, United States Code, Sections 1395 (a) and (b) as the action accrued and/or the Defendants *in rem* were found and seized in the Eastern District of Michigan.

## Defendants *In Rem*

6.     The Defendants *in rem* consist of the following:

a.   One Hundred Twenty-Five Thousand Eight Hundred Sixty-Five Dollars and Seven Cents ($125,865.07) in U.S. Currency from Signature Bank Account #XXXXXX6011 in the name of Global Healthcare Management, LLC.

b. Ninety-Seven Thousand Five Hundred Thirty-Nine Dollars and Three Cents ($97,539.03) in U.S. Currency from Signature Bank Account #XXXXXX3045 in the name of US Medical, LLC.

c. Twenty-Four Thousand Six Hundred Sixty-Eight Dollars and Four Cents ($24,668.04) in U.S. Currency from Signature Bank Account #XXXXXX5147 in the name of Woods Pharmacy, LLC.

d. Four Hundred Twenty-One Thousand Two Hundred Fifty-Nine Dollars and Twenty-Six Cents ($421,259.26) in U.S. Currency from Signature Bank Account #XXXXXX6003 in the name of Global Healthcare Management, LLC.

e. Forty-Eight Thousand Seven Hundred Forty-Five Dollars and Thirty-Six Cents ($48,745.36) in U.S. Currency from Signature Bank Account #XXXXXX3157 in the name of Keystone Choice Pharmacy.

f. Seven Hundred Thirteen Dollars and Seventy-Five Cents ($713.75) in U.S. Currency from TD Bank Account #XXXXXX8327 in the name of Livewell Holdings, LLC dba Great Lakes Medical Pharmacy, LLC.

g. Three Hundred Seventy-Eight Thousand Five Hundred Fifty-Four Dollars and Sixty-Five Cents ($378,554.65) in U.S. Currency from

TD Bank Account #XXXXXX7349 in the name of Great Lakes Medical Pharmacy, LLC dba All American Medical Pharmacy.

h. One Hundred Sixty-Five Thousand Nine Hundred Sixteen Dollars and Ninety-Five Cents ($165,916.95) in U.S. Currency from TD Bank Account #XXXXXX9424 in the name of A1C Holdings.

i. Nineteen Thousand One Hundred Eighty-Four Dollars and Ninety-Five Cents ($19,184.95) in U.S. Currency from TD Bank Account #XXXXXX8319 in the name of Great Lakes Medical Pharmacy, LLC.

j. Thirteen Thousand Four Hundred Seventy-Nine Dollars and Seven Cents ($13,479.07) in U.S. Currency from TD Bank Account #XXXXXX7357 in the name of Great Lakes Medical Pharmacy, LLC dba All American Medical Pharmacy, dba Brightsky Payroll.

7. The Defendants *in rem* described in Paragraph 6(a)-(j) shall be referred to collectively as the "Defendant Currency."

8. The Defendant Currency is, and will continue to be, in the custody of the United States Marshal's Service.

## **Underlying Statutory Basis For Civil Forfeiture**

9.     Title 18, United States Code, Section 1347 provides, in part:

(a) Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice –

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

10.     Title 18, United States Code, Section 1349 provides:

Any person who attempts or conspires to commit any offense under this chapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

11.     Title 18, United States Code, Section 1956, prohibits the laundering of

monetary instruments:

(a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to conduct such a financial transaction which in fact involves the proceeds of specified unlawful activity–

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code of 1986; or

(B) knowing that the transaction is designed in whole or in part-

6

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater…

12.    Title 18, United States Code, Section 1957, prohibits engaging in monetary transactions in property derived from specified unlawful activity "of a value greater than $10,000."

## **Relevant Forfeiture Statutes**

13.    Title 18, United States Code, Section 981(a)(1)(A) provides for the civil forfeiture to the United States of, "[a]ny property, real or personal, involved in a transaction or attempted transaction in violation of section 1956, 1957 or 1960 of this title, or any property traceable to such property."

14.    Title 18, United State Code, Section 981(a)(1)(C) provides for the civil forfeiture to the United States of the proceeds of crimes designated as "specified unlawful activities."

15.    Health Care Fraud in violation of Title 18, United States Code, Section 1347 and Health Care Fraud Conspiracy in violation of Title 18, United States Code, Section 1349 are specified unlawful activities pursuant to Title 18, United States Code, Section 1956(c)(7).

16.    Title 18, United States Code, Section 984 sets forth that "in any forfeiture action *in rem* in which the subject property is . . . funds deposited in an account in a financial institution . . . (A) it shall not be necessary for the Government to identify the specific property involved in the offense that is the basis for forfeiture; and (B) it shall not be a defense that the property involved in such an offense has been removed and replaced by identical property."

### Factual Basis

17.    The Defendant Currency is forfeitable to the United States of America pursuant to Title 18, United States Code, Section 981(a)(1)(A) and/or (C) because it:

a.    constitutes proceeds of and/or property traceable to the proceeds of illegal activity, specifically Health Care Fraud, in violation of Title 18, United States Code, Section 1347 and Health Care Fraud Conspiracy, in violation of Title 18, United States Code, Section 1349;

b.    constitutes the proceeds of and/or property involved in Money Laundering, in violation of Title 18, United States Code, Sections 1956, and/or 1957.

18.    The following facts establish a basis for forfeiture of the Defendant Currency:

*Medicare Program*

19.     The Medicare Program ("Medicare") is a federal health care program providing benefits to persons over the age of 65 or disabled.  Medicare is administered by the Centers for Medicare and Medicaid Services ("CMS"), a federal agency under the United States Department of Health and Human Services. Individuals who receive Medicare benefits are referred to as Medicare "beneficiaries."  Medicare is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

20.     The Medicare program includes coverage under the following parts: hospital insurance (Part A), medical insurance (Part B), medical advantage (Part C), and prescription drug benefits (Part D).

21.     Pharmacies may participate in Medicare Part D by entering a retail network agreement directly with a plan or with one or more Pharmacy Benefit Managers (PBMs). A PBM acts on behalf of one or more Medicare drug plans. Through a plan's PBM, a pharmacy can join the plan's network.

22.     When a Medicare Part D beneficiary presents a prescription to a pharmacy, the pharmacy submits a claim either directly to the plan or to a PBM that represents the beneficiary's Medicare drug plan.  The plan or PBM determines whether the pharmacy is entitled to payment for each claim and periodically pays the pharmacy for outstanding claims. The drug plan's sponsor reimburses the PBM

for its payments to the pharmacy.  PBMs sometimes contract with Pharmacy Services Administrative Organizations (PSAOs) to administer some of its services, including reimbursement to the pharmacy.

23.     Medicare, through CMS, compensates the Medicare drug plan sponsors and pays the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans.  Such payments are called capitation fees.  The capitation fee is adjusted periodically based on various factors, including the beneficiary's medical conditions.  In addition, in some cases where a sponsor's expenses for a beneficiary's prescription drugs exceed that beneficiary's capitation fee, Medicare reimburses the sponsor for a portion of those additional expenses.

24.     By becoming a participating provider in Medicare, enrolled providers agree to abide by the policies and procedures, rules, and regulations governing reimbursement.  To receive Medicare funds, enrolled providers, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and applicable policies and procedures, rules, and regulations, issued by CMS and its authorized agents and contractors.

25.     Medicare providers are required to maintain all records that disclose the extent of services provided and significant business transactions for at least a period of six years.

26.     Health Integrity is the Medicare Part C and Part D program integrity contractor for CMS under the National Benefit Integrity (NBI) Medicare Drug Integrity Contract (MEDIC).  The purpose of MEDIC is to detect, prevent, and investigate allegations of fraud, waste, and abuse in the Part C (Medicare Advantage Organizations) and Part D (Prescription Drug Coverage) programs on a national level.

### The Fraud Scheme

27.     Defendants *in rem* constitute the proceeds of health care fraud and were subsequently involved in money laundering. The fraud scheme was perpetrated by All American Medical Pharmacy (AAMP), its owners, and affiliated entities.  AAMP, located in Warren, Michigan, is a business under the corporate umbrella of Livewell Holdings LLC. AAMP is also a dba for Great Lakes Medical Pharmacy LLC and Brightsky.  For purposes of this complaint, AAMP will include Great Lakes Medical Pharmacy LLC, Brightsky, and Livewell Holdings LLC unless differentiations are needed. These entities are owned, operated, and/or managed by James Letko and co-conspirators Jon Letko, Edward Letko, Steven King, and Jeffrey Kolmer.

28.     Defendants *in rem* were obtained through a multi-step healthcare fraud scheme. AAMP determined which prescriptions had high reimbursement rates and would generate the greatest amount of profit. AAMP used a related

business entity to solicit non-client Medicare beneficiaries to use high reimbursement drugs, such as lidocaine.  AAMP sent medication, namely lidocaine, to beneficiaries without their permission and dispensed medically unnecessary medication without valid prescriptions.  AAMP fraudulently used physicians' national provider numbers (NPIs) to facilitate reimbursement of their Medicare claims.

29.     Between January 1, 2013 and January 18, 2017, Medicare reimbursed claims submitted by AAMP in the amount of $49,248,306.97, of which $37,470,447.44 was for lidocaine claims.

30.     Medicare reimbursed AAMP for lidocaine prescription claims for which the listed prescribing physician did not, in fact, prescribe lidocaine.

### *Determination of High Reimbursement Rate Prescriptions*

31.     AAMP was divided into functional departments, including a data entry department

32.     The data entry department was responsible, in part, for submitting claims on behalf of AAMP to Medicare Part D for reimbursement.

33.     AAMP employees identified medications that were profitable or had a high reimbursement rate.  To do this, AAMP employees submitted "test claims" to patients' insurance companies, including Medicare.

34.     When test claims were successfully reimbursed, AAMP initiated a "campaign" to get AAMP patients with reimbursing insurance plans, including Medicare, to use the high reimbursement medication.  Lidocaine was one such medication where successful test claims led to an AAMP campaign.

**Solicitation of Prescriptions**

35.     The owners of AAMP also owned a related business entity in Miramar, Florida called All American Medical Supplies (AAMS) and this entity managed certain functions for AAMP, including the solicitation of physicians to prescribe lidocaine, and beneficiaries to request and use lidocaine.

36.     AAMP used a software program that allowed AAMP to access patient information from associated pharmacies.  The program specifically contained information for patients who were getting diabetic supplies, including testing strips.

37.     A "solicitation team" in Miramar, Florida used the software program to identify and contact AAMP patients who received diabetic supplies.  The solicitation team contacted this targeted group of patients for the purpose of convincing them to obtain Lidocaine, for which Medicare would pay reimbursements.

38.     The Miramar solicitation team also solicited patients to convince them to obtain diabetic testing supplies from AAMP.

39.     Solicitors then sought patients' doctors to sign AAMP forms for the pharmacy-suggested amount of lidocaine.

40.     The AAMS call center repeatedly faxed prepopulated prescription forms for lidocaine to patients' medical providers.  The prepopulated prescription forms were ready-made prescriptions for lidocaine, with the suggested amounts of lidocaine already filled out. The prepopulated prescription forms had the same suggested amounts of lidocaine and only required a prescriber's signature and/or NPI.  Once the pre-populated prescription had a medical provider's signature and/or NPI, they were faxed back to AAMP.  AAMP employees treated these forms as a written prescription for lidocaine and the prescription was filled by AAMP employees.

41.     The forms were sent six times and if no response was received, a solicitor from Miramar called the doctors' offices.

42.     The following facts set forth one example of AAMP's solicitation of prescriptions and misappropriation of a medical provider's signature and/or NPI:

a.      Prior to filling the prescription, AAMP sent a prescription form to the physician for lidocaine in the amount of 248.08 gm for 30 days. The physician returned the form, with "denied" written in large letters over the signature line with the physician's name printed beneath it.

b.     The physician provided the health plan administering Medicare for the

patient with a prescription verification form concerning the

prescription, stating "I never prescribed this medication."

c.     The physician had been seeing the patient since December 22, 2015

and had never prescribed lidocaine.  The physician did not prescribe

lidocaine to patients because it was not found to be effective.

43.     When AAMS call center employees called a provider's office, they

would generally speak with members of the provider's staff, such as a medical

assistant.  Once the medical assistant or other staff member was on the phone,

AAMP pharmacists would be conferenced into the call for the purpose of taking a

verbal order.   AAMP pharmacists filled these verbal orders in the same way they

filled written prescriptions.

44.     AAMP pharmacists were not required by AAMP to confirm the

prescription with the medical provider, and generally did not do so, before filling

the prescriptions.

45.     In some instances, AAMS employees did not include AAMP

pharmacists in verbal order calls with providers' offices.  Instead, AAMS call

center employees obtained the verbal orders themselves from the medical

providers' staff and emailed AAMP pharmacists their recorded conversations.  The

recorded conversations were typically between AAMS call center employees and

medical assistants, not the actual medical provider.  AAMP pharmacists listened to these emailed recorded conversations and were directed to treat them the same as the verbal orders, meaning these "prescriptions" were subsequently filled and mailed out to patients.

46.     The AAMP customer service department received calls from medical providers who stated they never prescribed the lidocaine sent to AAMP patients and were upset because they did not prescribe the medication sent to their patient by AAMP.

47.     When doctors told AAMP pharmacists they did not prescribe medication, the patients' data was deleted from AAMP's computer system.

48.     In one example of this routine practice, a supervisor at AAMP directed an AAMP pharmacist to provide patient information to an AAMP employee who then deleted the patient from the system.

49.     The files were deleted because the prescriptions filled for the patients were "bad" and AAMP did not want a record of it.

50.     AAMP could only bill Medicare Part D and could not use their provider number to bill Medicare Part B.  Because of this, AAMS also performed AAMP's Medicare Part B billing.  For example, diabetic testing supplies were billed to Medicare Part B by AAMS as DME.  Though billing was performed by

AAMS in Miramar, the DME prescriptions were received, dispensed, and shipped out by AAMP employees.

*Misuse of Physician Signatures and/or NPI*

51.    In addition to improperly soliciting requests for lidocaine from Medicare beneficiaries and prescriptions from the staffs of medical providers, AAMP, its owners, and related entities, used physician signatures and/or NPI without the medical provider' permission to fill out prescriptions and make it appear as though the prescription was legitimate.

52.    For example, federal agents determined during the course of their investigation that claims, on behalf of seven beneficiaries, submitted by AAMP to Medicare for reimbursement of lidocaine prescriptions were not, in fact, prescribed by the listed physician or medical provider

53.    AAMP was reimbursed by Medicare for these fraudulent claims.

*Delivery of Fraudulently Prescribed Prescriptions and*

54.    After soliciting prescriptions, AAMP would fill the prescriptions and deliver them to patients. The following is one such example:

> a.    The patient had never heard of lidocaine before AAMP sent it to him.  The patient contacted his physician who told him the physician had not prescribed the lidocaine.

b.    After the patient confirmed he had not been prescribed

lidocaine, the patient's son contacted AAMP.  An AAMP

representative told Patient 1's son they were not going to do

anything because the doctor had prescribed it.  Patient 1's son

told the AAMP representative that he had contacted at

Medicare to report the receipt of non-prescribed lidocaine.

c.    The patient's son subsequently received a call from an AAMP

representative who told him to send back the lidocaine.  Patient

1's son did not send back the lidocaine.

d.    The Lidocaine was shipped to Patient 1 from the Warren

Michigan address. The shipping date on the label was

"04APR16."  There was an invoice enclosed from "All

American Medical Pharmacy Formerly BrightSky" and the date

processed according to the invoice was "04/04/2016."  The total

price on the invoice was $1,031.10, the insurance payment

amount was $1,029.90, the patient pay amount was $1.20, and

the dispensed quantity was 248.08 gm.  According to the

invoice there were 11 refills left and the patient's physician was

listed as the prescriber.  Inside the shipping box were seven

small boxes containing tubes of "Lidocaine Ointment USP,

5%." There was an All American Medical Pharmacy sticker label attached to the boxes, which were bundled/attached to each other. The label had the date 4/4/2016, the physician's name, and the address Warren, Michigan address.

e.   According to claims data for AAMP, the lidocaine prescription for the patient was written on March 30, 2016 and AAMP dispensed the lidocaine on April 4, 2016. The cost of the drug was $1,031.10, the amount paid by Cigna on behalf of Medicare was $1,029.90, and the patient pay amount was $1.20.

55.   AAMP received approximately 10 lidocaine returns per day to be processed and put back into inventory to be re-dispensed.

56.   AAMP had a set of procedures to follow when patients did not want to continue lidocaine use. First, the customer service representative to try to convince patients who did not want the lidocaine to continue using it. Second, if customer service was not successful, AAMP pharmacists would receive an email directive to contact the patients to convince them to continue using lidocaine.

57.   Customer service employees were reprimanded by management if they closed out too many lidocaine patients (i.e. the patients requested termination of lidocaine prescription).

*Submission of Fraudulent Claims for Reimbursement*

58.     AAMP used physician NPI numbers and signatures and/or NPI to make it appear as if prescriptions had been properly prescribed by a medical provider, where no physician had, in fact, prescribed or intended to prescribe the medication or DME, for the purpose of obtaining reimbursements from Medicare and other insurers.

59.     For example, pediatric endocrinologist in Michigan, was the purported prescribing physician for over 100 Medicare beneficiaries on claims that were billed to Medicare by AAMP, which he did not actually prescribe.

60.     In June 2016, the physician received correspondence from a Medicare administrating health plan. The health plan sent the physician a list of over 100 Medicare beneficiaries purportedly seen by the physician and prescribed medication by the physician.  This correspondence requested that the physician confirm or deny whether the physician actually saw these patients and prescribed them medication.  The physician confirmed seeing only six  out of over 100 of these patients.  The physician adamantly denied seeing or writing prescriptions for nearly all the patients on the list.

61.     The physician did not provide care, or write prescriptions, for any of the Medicare beneficiaries for whom AAMP submitted claims to Medicare for reimbursement, listing the physician as the prescribing physician between January

2014 to January 2016, resulting in over $23,000.00 in Medicare reimbursements to AAMP.

62.     AAMP employees submitted claims to Medicare and insurance plans using NPIs for doctors (prescribers) the patients never saw.

63.     AAMP had a list of doctors' NPI numbers that they used to create fraudulent prescriptions for patients.

64.     AAMP patients received prescriptions from doctors they never saw and who, in many cases, were located in a different part of the country.

65.     AAMP employees submitted the claims to Medicare, through intermediaries, for reimbursement of these fraudulent prescriptions.

### **Facts Supporting Forfeiture of Defendants *in rem***

66.     As set forth in the paragraphs above, James Letko and co-conspirators Jon Letko, Edward Letko, Steven King, Jeffrey Kolmer, and possibly others, doing business as AAMP, and affiliated entities, engaged in healthcare fraud and derived millions of dollars in proceeds from that illegal activity.  The proceeds of this healthcare fraud scheme were deposited into the accounts described in the paragraphs below. Defendants *in rem* constitute proceeds of the fraud scheme or were funds used to conceal or disguise the nature, location, source, ownership, or control of the fraud proceeds (i.e. involved in money laundering).

67.     The following chart lists the accounts from which Defendants *in rem* were seized. The "Tier" designation identifies the manner in which the account received the Medicare funds. Forfeiture of Defendants *in rem* is based on an analysis of fraud proceeds obtained between January 1, 2016 to July 31, 2016, this being the period encompassing a significant part of the Medicare Part D fraud scheme involving the sale of lidocaine.  There are four "Tiers" associated with this investigation:

a.     The "TIER ONE" account received direct deposits from Medicare Part D, through PSAOs and PBMs, which constituted reimbursements for fraudulent claims generated by the healthcare fraud scheme perpetrated by AAMP, its owners, and affiliated entities.

b.     Accounts with a "TIER TWO" designation received illegally obtained funds by way of transfer of funds, wire, deposits of checks, interbank transfers or by withdrawal and deposits from a Tier One account. These accounts are owned/controlled by AAMP, its owners, or affiliated entities, and were used to conceal or disguise the nature, location, source, ownership, or control of the fraud proceed.

c.     Accounts with a "TIER THREE" designation are directly related to tracing of fraudulent payments of Medicare Part D program funds deposited into these accounts from the second tier accounts previously

identified as receiving illegally obtained Medicare Part D funds. These accounts are owned/controlled by AAMP, its owners, or affiliated entities, and were used to conceal or disguise the nature, location, source, ownership, or control of the fraud proceed.

d.  Accounts with a "TIER FOUR" designation are directly related to tracing of fraudulent payments from the third tier accounts. These accounts are owned/controlled by AAMP, its owners, or affiliated entities, and were used to conceal or disguise the nature, location, source, ownership, or control of the fraud proceed.

e.  Accounts with a "TIER FIVE" designation are directly related to tracing of fraudulent payments from the fourth tier accounts. These accounts are owned/controlled by AAMP, its owners, or affiliated entities, and were used to conceal or disguise the nature, location, source, ownership, or control of the fraud proceed.

**Bank and Investment Accounts Subject To Forfeiture:**

| Financial Institution | Account # | Account Name | Tier |
|---|---|---|---|
| TD Bank | XXXXXX8319 | Great Lakes Medical Pharmacy LLC | 1 |
| TD Bank | XXXXXX9424 | A1C Holdings | 2 |
| Signature Bank | XXXXXX7349 | Great Lakes Medical Pharmacy LLC, dba All | 2 |

| | | American Medical Pharmacy | |
|---|---|---|---|
| TD Bank | XXXXXX8327 | Livewell Holdings LLC, dba Great Lakes Medical Pharmacy LLC | 3 |
| Signature Bank | XXXXXX7357 | Great Lakes Medical Pharmacy LLC, dba All American Medical Pharmacy, dba Brightsky Payroll | 3 |
| Signature Bank | XXXXXX3045 | US Medical, LLC | 3 |
| Signature Bank | XXXXXX6003 | Global Healthcare Management, LLC | 3 |
| Signature Bank | XXXXXX6011 | Global Healthcare Management, LLC | 4 |
| Signature Bank | XXXXXX3157 | Keystone, LLC | 4 |
| Signature Bank | XXXXXX5147 | Woods Pharmacy, LLC | 5 |

***Tier One Account***

TD Bank account XXXXXX8319 - Defendant *in rem* $19,184.95

68.  **TD Bank account XXXXXX8319** is held by Livewell Holdings LLC, dba Great Lakes Medical Pharmacy. The account was opened on or about November 14, 2013, in the business name Great Lakes Medical Pharmacy, LLC located in Miramar, Forida.  Signers on the account include James Letko, Edward Letko, Ingrid Swenson, and Kenneth Drazan.

69.   AAMP, its owners, or affiliated entities, used **TD Bank account XXXXXX8319** to receive Medicare Part D reimbursements of AAMP claims for filling fraudulent prescriptions, including lidocaine prescriptions.

70.   For the period of January 2016 through July 2016, TD Bank account number XXXXXX8319 received approximately $20,937,714.17 in 135 direct deposit Medicare reimbursements from entities identified on the bank statements as Elevate and Good Neighbor Pharmacy Providers Network.

71.   Elevate Provider Network (Elevate) is a PSAO. Good Neighbor, similar to Elevate, is used as a central payment center for PBMs. Both are used to process Medicare Part D reimbursements.

72.   Defendant *in rem* $19,184.95 in U.S. Currency was seized from this account and constitutes proceeds of health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy in violation of 18 U.S.C. § 1349. Defendant *in rem* is subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C).

*Tier Two Accounts*

Signature Bank XXXXXX7349 - Defendant *in rem* $378,554.65

73.   **Signature Bank XXXXXX7349** is held by Great Lakes Medical Pharmacy, dba All American Medical Pharmacy. It was opened on or about February 2, 2017 in the business name Great Lakes Medical Pharmacy, LLC, dba

All American Medical Pharmacy, located in Warren, Michigan.  The account was held in the name of James Letko and Jeffrey Kolmer.

74.     AAMP, its owners, or affiliated entities, transferred Medicare Part D reimbursements of AAMP claims into **Signature Bank XXXXXX7349**.

75.     For the period of January 2016 through June 2016, **Signature Bank XXXXXX7349** received approximately $5,382,912 in 31 transfers from Tier One TD Bank account XXXXXX8319.

76.     Defendant *in rem* $378,554.65 in U.S. Currency was seized from this account. Defendant *in rem* $378,554.65 in U.S. Currency constitutes proceeds of health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

TD Bank account XXXXXX9424 - Defendant *in rem* $165,916.95

77.     **TD Bank account XXXXXX9424** was held in the name of A1C Holdings, LLC located at 3640 Miramar, Florida. Steven King is the registered agent.  Jeffrey Kolmer and James Letko are listed as managers.

78.     AAMP, its owners, or affiliated entities, transferred Medicare Part D reimbursements of AAMP claims into **TD Bank account XXXXXX9424**.

79.     For the period of February 2016 through July 2016, **TD Bank account XXXXXX9424** received approximately $7,439,900 in 45 transfers from Tier One TD Bank account XXXXXX8319.

80.     Defendant *in rem* $165,916.95 in U.S. Currency was seized from this account. Defendant *in rem* $165,916.95 in U.S. Currency constitutes proceeds of health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

**Tier Three Accounts**

Signature Bank XXXXXX3045 - Defendant *in rem* $97,539.03

81.     **Signature Bank XXXXXX3045** is held by US Medical LLC, located in Milford, New Jersey. The account was opened on or about October 6, 2009. Signers on the account are James Letko and Edward Letko.

82.     AAMP, its owners, or affiliated entities, transferred Medicare Part D reimbursements of AAMP claims from Tier Two accounts into **Signature Bank XXXXXX3045**.

83.     For the period of March 2016 through April 2016, **Signature Bank XXXXXX3045** received approximately $133,726.50 in six transfers from Tier Two account TD Bank account XXXXXX9424.

84.     **Signature Bank XXXXXX3045** also received transfers from two Tier Four accounts: (i) $2,304,410.50 in 33 transfers between January and July 2016 from Signature Bank XXXXXX5147, and (ii) $32,852 on May 31, 2016, from Signature Bank XXXXXX3157

85.     Defendant *in rem* $97,539.03 in U.S. Currency was seized from this account. Defendant *in rem* $97,539.03 in U.S. Currency constitutes proceeds of health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

<u>Signature Bank XXXXXX6003</u> - Defendant *in rem* $421,259.26

86.    **Signature Bank XXXXXX6003** is held by Global Healthcare
Management LLC located in Milford, New Jersey. The account was opened on or
about December 12, 2012.  Signers on the account are Jon Letko and Jeffrey
Kolmer.

87.    AAMP, its owners, or affiliated entities, transferred Medicare Part D
reimbursements of AAMP claims from Tier Two accounts into **Signature Bank
XXXXXX6003**.

88.    For the period of June 2016 through July 2016, **Signature Bank
XXXXXX6003** received approximately $39,661.96 in two transfers from Tier Two
account Signature Bank XXXXXX7349.

89.    **Signature Bank XXXXXX6003** also received transfers from three
other affiliated accounts: (i) $2,055,0009 in 29 transfers between January and July
2016 from an account held by AAMS, (ii) $42,500 on between February and July
2016 from Tier Three account Signature Bank XXXXXX3045, and (iii) $706,907
between June and July 2016 from Tier Four account Signature Bank
XXXXXX3157.

90.    Defendant *in rem* $421,259.26 in U.S. Currency was seized from this
account. Defendant *in rem* $421,259.26 in U.S. Currency constitutes proceeds of
health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy

in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

TD Bank account XXXXXX8327 - Defendant *in rem* $713.75

91.   **TD Bank account XXXXXX8327** is held by Livewell Holdings LLC, dba Great Lakes Medical Pharmacy. The account was opened on or about November 14, 2013 in the business name Great Lakes Medical Pharmacy, LLC, located in Miramar, Florida.  The account signers are James Letko, Edward Letko, Ingrid Swenson, and Kenneth Drazan.

92.   AAMP, its owners, or affiliated entities, transferred Medicare Part D reimbursements of AAMP claims from Tier Two accounts into **TD Bank account XXXXXX8327**.

93.   For the period of January 2016 through June 2016, **TD Bank account XXXXXX8327** received approximately $5,740,000 in 37 transfers from Tier Two account Signature Bank XXXXXX7349.

94.   Defendant *in rem* $713.75 in U.S. Currency was seized from this account. Defendant *in rem* $$713.75 in U.S. Currency constitutes proceeds of health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy

in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

Signature Bank XXXXXX7357 - Defendant *in rem* $13,479.07

95.     **Signature Bank XXXXXX7357** is held by Great Lakes Medical Pharmacy, dba All American Medical Pharmacy, dba Brightsky.  The account was opened on or about February 17, 2016 in the business name Great Lakes Medical Pharmacy, LLC, dba All American Medical Pharmacy, located in Warren, Mchigan.  Signers on the account are James Letko and Jeffrey Kolmer.

96.     AAMP, its owners, or affiliated entities, transferred Medicare Part D reimbursements of AAMP claims from Tier Two accounts into **Signature Bank XXXXXX7357**.

97.     For the period of June 2016 through July 2016, **Signature Bank XXXXXX7357** received approximately $194,000 in two transfers from Tier Two account TD Bank XXXXXX9424, and approximately $45,000 on July 27, 2016, from Tier Two account Signature Bank XXXXXX7349.

98.     Defendant *in rem* $13,479.07 in U.S. Currency was seized from this account. Defendant *in rem* $13,479.07 in U.S. Currency constitutes proceeds of

health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

99.     Defendant *in rem* $13,479.07 in U.S. Currency is also subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A) as it was involved in a violation of 18 U.S.C. § 1957 in that:  (1) the approximately $45,000 deposit on July 27, 2016 was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were derived from health care fraud and a conspiracy to commit health care fraud in violation of 18 U.S.C. §§ 1347 and 1349, which are specified unlawful activities under 18 U.S.C. § 1956(c)(7)(F); and (4) the transaction occurred in the United States.

**Tier Four Accounts**

Signature Bank XXXXXX6011 - Defendant *in rem* $125,865.07

100.   **Signature Bank XXXXXX6011** is held by Global Healthcare Management LLC, located in Milford, New Jersey.  The account was opened on December 12, 2012.  Signers are the account are Jon Letko and Jeffrey Kolmer.

101.    AAMP, its owners, or affiliated entities, transferred Medicare Part D reimbursements of AAMP claims from Tier Two accounts, to Tier Three accounts, then into **Signature Bank XXXXXX6011**.

102.    For the period of January 2016 through July 2016 **Signature Bank XXXXXX6011** received approximately $5,050,000 in 16 transfers from Tier Three account Signature Bank XXXXXX6003.

103.    Defendant *in rem* $125,865.07 in U.S. Currency was seized from this account. Defendant *in rem* $125,865.07 in U.S. Currency constitutes proceeds of health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

Signature Bank XXXXXX3157 - Defendant *in rem* $48,745.36

104.    **Signature Bank XXXXXX3157** is held by Keystone Choice Pharmacy located in Easton, Pennsylvania.  The account was opened on or about July 31, 2015.  Signers on the account are Jon Letko and Jeffrey Kolmer.

105.    AAMP, its owners, or affiliated entities, transferred Medicare Part D reimbursements of AAMP claims from Tier Two accounts, to Tier Three accounts, then into **Signature Bank XXXXXX3157**.

106.    For the period of March 2016 through June 2016, **Signature Bank XXXXXX3157** received approximately $4,044 in two transfers from Tier Three account Signature Bank XXXXXX3045.

107.    Defendant *in rem* $48,745.36 in U.S. Currency was seized from this account. Defendant *in rem* $48,745.36 in U.S. Currency constitutes proceeds of health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

**Tier Five Account**

Signature Bank XXXXXX5147 - Defendant *in rem* $24,668.04

108.    **Signature Bank XXXXXX5147** is held in the name of Woods Pharmacy LLC, located in Old Bridge, New Jersey.  The account was opened on or about May 14, 2015.  Signers on the account are Jon Letko and Jeffrey Kolmer.

109.   AAMP, its owners, or affiliated entities, transferred Medicare Part D reimbursements of AAMP claims from Tier Two accounts, to Tier Three accounts, to Tier Four accounts, then into **Signature Bank XXXXXX5147**.

110.   On February 16, 2016, **Signature Bank XXXXXX5147** received a approximately $40,313.04 in transfer from Tier Four account Signature Bank XXXXXX3157.

111.   Defendant *in rem* $24,668.04 in U.S. Currency was seized from this account. Defendant *in rem* $24,668.04 in U.S. Currency constitutes proceeds of health care fraud in violation of 18 U.S.C. § 1347 and health care fraud conspiracy in violation of 18 U.S.C. § 1349, and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(C), and/or was involved in transactions to conceal or disguise the nature, source, location, ownership, and control of the criminal proceeds in violation of 18 U.S.C. § 1956(a)(1)(B)(i), and is therefore subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A).

112.   Defendant *in rem* $24,668.04 in U.S. Currency is also subject to civil forfeiture under 18 U.S.C. § 981(a)(1)(A) as it was involved in a violation of 18 U.S.C. § 1957 in that:  (1) the approximately $40,313.04 deposit on February 16, 2016 was a monetary transaction involving criminally derived funds; (2) those criminally derived funds had a value greater than $10,000; (3) the funds were derived from health care fraud and a conspiracy to commit health care fraud in

violation of 18 U.S.C. §§ 1347 and 1349, as well as money laundering in violation

of 18 U.S.C. § 1956(a)(1)(B)(i), which are specified unlawful activities under 18

U.S.C. §§ 1956(c)(7)(A) and (F); and (4) the transaction occurred in the United

States.

## CLAIMS FOR RELIEF

113.   Plaintiff re-alleges and incorporates by reference each and every

allegation contained in Paragraphs 1 through 112 and the subparagraphs therein.

114.   The Defendant Currency is forfeitable to the United States of America

pursuant to Title 18, United States Code, Section 981(a)(1)(A) and/or (C) as

proceeds and/or are property traceable to the proceeds of illegal activity,

specifically Health Care Fraud, in violation of Title 18, United States Code,

Section 1347 and/or Health Care Fraud Conspiracy, in violation of Title 18, United

States Code, Section 1349 and/or as proceeds of and/or property involved in

Money Laundering, in violation of Title 18, United States Code, Sections 1956

and/or 1957.

## DEMAND FOR JURY TRIAL

Plaintiff respectfully requests a trial by jury in this case.

## CONCLUSION AND RELIEF

Plaintiff respectfully requests that a warrant for arrest of the Defendants *in rem* be issued; that due notice be given to all interested parties to appear and show cause why forfeiture should not be decreed; that judgment be entered declaring the Defendants *in rem* to be condemned and forfeited to the United States for disposition according to law; and that the United States be granted such other further relief as this Court may deem just and proper together with costs and disbursements of this action.

Respectfully submitted,

DANIEL L. LEMISCH
Acting United States Attorney

Shankar Ramamurthy
Philip A. Ross
Assistant United States Attorneys
211 W. Fort St., Suite 2001
Detroit, MI 48226
(313) 226-9562
shankar.ramamurthy@usdoj.gov
Dated: September 29, 2017          (IL Bar No. 6306790)

## **VERIFICATION**

I, Andrew Crump, state that I am a Special Agent of the Federal Bureau of Investigation ("FBI").  I have read the foregoing Complaint for Forfeiture, and declare under penalty of perjury that the facts contained therein are true and correct to the best of my knowledge and belief, based upon knowledge possessed by me and/or on information received from other law enforcement agents.

Special Agent Andrew Crump
Special Agent
Federal Bureau of Investigation

Dated:  September 29, 2017